# EXHIBIT A

## FIRST AMENDED AND RESTATED
## LOAN AGREEMENT

This First Amended and Restated Loan Agreement effective as of March 9, 2015 (the "Agreement") is by and among **FIRST MIDWEST BANK**, a banking association, (the "Lender"), and **I80 EQUIPMENT, LLC**, an Illinois limited liability company (the "Borrower"):

## RECITALS

a.    The Borrower previously requested that the Lender provide the Borrower with a working capital line of credit for truck purchases and improvements in the amount of Nine Million Five Hundred Thousand and no/100 Dollars ($9,500,000.00), and an additional working capital line of credit loan for trade receivables and truck parts in the amount of Five Hundred Thousand and no/100 Dollars ($500,000.00);

b.    Borrower and Lender entered into a Loan Agreement dated March 10, 2014 (the "Prior Loan Agreement");

c.    The Borrower previously secured such loans by granting the Lender a security interest in certain of its assets by a separate Security Agreement dated March 10, 2014 (the "Prior Security Agreement");

d.    Borrower has requested that the Lender renew and extend the maturity dates for the Working Capital Line of Credit Promissory Note and the Secondary Working Capital Line of Credit Promissory Note for one year and provide an additional Working Capital Line of Credit for crane purchases and improvements in the amount of Two Million and no/100 Dollars ($2,000,000.00); and

e.    Borrower has agreed to secure the three loans by granting the Lender a security interest in certain of its assets by a separate Amended and Restated Security Agreement dated the date hereof (the "Security Agreement").

Therefore, the parties agree as follows:

1.    **DEFINITIONS AND ACCOUNTING MATTERS.**  As used herein, the following terms shall have the following meanings, which meanings may be used in the singular or plural as appropriate in the context so used:

a.    "Affiliate" shall mean entities which constitute a branch, division, subsidiary, or parent of the other, or entities in which there is direct or indirect ownership of five percent (5%) or more of the voting stock or ownership interests of the other.

b.  "Borrower" shall mean I80 Equipment, LLC, an Illinois limited liability company.

c   "Borrowing Base" means, as to the Working Capital Line of Credit, an amount equal to eighty percent (80%) of the cost of Vehicle Collateral that is Eligible Inventory including costs for improvement to such Vehicle Collateral; as to the Secondary Working Capital Line of Credit, an amount equal to the sum of eighty percent (80%) of "Eligible Accounts Receivable" and eighty percent (80%) of the cost of Collateral constituting vehicle parts that is Eligible Inventory; and as to the Third Working Capital Line of Credit, an amount equal to eighty percent (80%) of the cost of Crane Collateral that is Eligible Inventory including costs for improvements to such Crane Collateral.   The Borrowing Base shall be determined by a submission of a borrowing base certificate on a form acceptable to the Lender (the "Borrowing Base Certificate") on the dates set forth in Paragraph 7(a)(5) hereof.  An officer or agent of the Borrower who is approved by the Lender shall sign the Borrowing Base Certificate on behalf of the Borrower.

d.  "Collateral" shall have the meaning ascribed thereto in the Security Agreement.

e.  "Crane Collateral" shall include all cranes of any kind and identified by VIN or other recognized and traceable identification number in which Borrower has any rights whether now existing or hereafter from time to time acquired.

f.  "Credit Agreements" means this Agreement and any other document (including financial statements), instrument or certificate provided in connection with this Agreement or any supplement to this Agreement, and includes the Promissory Notes and any documents evidencing a security interest, lien or encumbrance in favor of the Lender as well as any guaranty issued by the Guarantor.

g.  "Customer" means a customer of the Borrower but shall not include an employee, agent, shareholder, officer, director, subsidiary of or a person otherwise affiliated with the Borrower.

h.  "Distributions" shall mean any distribution to an Owner of the Borrower arising from the ownership of stock, partnership or membership interest or instruments evidencing equity or debt of the Borrower other than Sub-Chapter S tax distributions permitted at Section 6(k) of this Agreement or payments owing on Subordinated Debt as allowed herein.

i.  "Eligible Accounts Receivable" means a receivable owing by a Customer which is acceptable to the Lender in its sole discretion, but at least is continuously in compliance with all of the following:

(1)  The receivable is an account which arose in the ordinary course of business of the Borrower from or in connection with a bona fide sale of goods or rendition of services performed in accordance with an order or contract, oral or written, wherein all obligations of the Borrower regarding the shipment or delivery of such goods or customer have been satisfied or the services have been performed for the Customer;

2

(2)     The rights of the Borrower in and to the receivable and the proceeds thereof are not subject to any assignment, claim, lien, security interest, or other encumbrance, other than those contemplated by this Agreement;

(3)     The receivable is not disputed nor subject to offset, credit allowance, contra account or adjustment by the Customer for reason of consignment, guaranteed sale, sale on approval, or other terms by reason of which payment may be conditional, except discounts offered by the Borrower in the ordinary course of business;

(4)     The receivable has been due and payable for ninety (90) days or less from the date the receivable is due and owing by its terms.

(5)     The receivable is not owing by a foreign (organized in a country other than the United States) Customer of the Borrower unless fully secured by an advised and confirmed letter of credit issued by a domestic bank acceptable to Lender or unless the foreign Customer is a subsidiary of a domestic (organized in the United States) company; and

(6)     The receivable is not owed by a Customer who has filed or has had filed against it a petition in bankruptcy or an application for relief under any similar bankruptcy, insolvency or debtor-in-relief act; or who has had appointed a trustee, custodian or receiver; or who has made an assignment for the benefit of creditors; or who has become insolvent or fails to pay its debts as they become due.

j.     "Eligible Inventory" means inventory valued at cost and excludes inventory that is slow moving, or obsolete or less marketable than normal inventory (as determined by the Lender in its sole discretion), or on display, or on consignment.

k.     "Environmental Law" means any federal, state or local environmental statute, regulation, ordinance, law or decree presently in effect or that may be promulgated in the future, as such statutes, regulations and ordinances may be amended from time to time, including without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. 9601 et seq., ("CERCLA"), the Resource Conservation and Recovery Act, as amended, 42 U.S.C. 6901 ("RCRA"), and the common law.

l.     "Event of Default" means each and every event specified in Section 9 of this Agreement.

m.     "GAAP" means generally accepted accounting principles consistently applied.

n.     "Guarantor" means Erik Jones.

o.     "Hazardous Substances" means any substance or material defined or designated as hazardous or toxic waste, hazardous or toxic material, a hazardous or toxic substance, or infectious material, substance or waste, or other similar term, by any Environmental Law, or including, without limitation, asbestos, petroleum products and fly ash.

3

p.  "Interest and Charges" means interest, charges, expenses, costs of Lender's inspections of inventory and Collateral and other items incurred by the Lender under the Credit Agreements which are chargeable to the Borrower and which shall be billed directly to the Borrower.

q.  "LIBOR Rate" means the 1 Month London Interbank Offered Rate for United States Dollars published by Bloomberg, the Wall Street Journal or other comparable services selected by the Bank. The LIBOR Rate is to be strictly interpreted and is not intended to serve any other purpose other than providing an index to determine the interest rate used herein. As of the date hereof the LIBOR Rate is 0.175%.

r.  "Loan Account" means the account of the Borrower on the books of the Lender in which the Lender shall record all loans and/or advances made by the Lender to the Borrower on or pursuant to each Promissory Note executed hereunder, Interest and Charges, payments made on such loans and/or advances by the Borrower; and other appropriate debits and credits as provided herein.

s.  "Material Adverse Change" has the meaning set forth in the Security Agreement.

t.  "Fixed Charge Coverage Ratio" means that ratio resulting from the calculation set forth at Section 8 of this Agreement.

u.  "Maximum Debt to Tangible Net Worth Ratio" means that ratio resulting from the total liabilities of the Borrower divided by tangible net worth.

v.  "Obligations" means any and all indebtedness, obligations, and liabilities of the Borrower to the Lender of every kind and description, direct or indirect, secured or unsecured, joint or several, absolute or contingent, due or to become due, whether for payment or performance, now existing or hereafter arising, regardless of how the same arise or by what instrument, agreement or book account they may be evidenced, or whether evidenced by any instrument, agreement or book account, including, without limitation: all loans (including any loan by renewal or extension); all indebtedness, all undertakings to take or refrain from any action; all indebtedness, liabilities or obligations owing from the Borrower to others which the Lender may have obtained by purchase, negotiation, discount, assignment or otherwise; and all interest, taxes, fees, charges, expenses and attorney's fees chargeable to the Borrower or incurred by the Lender under this Agreement or in any other document or instrument delivered hereunder or as a supplement hereto. Obligations shall also include any and all indebtedness, obligations and liabilities of any Subsidiary or affiliate of the Borrower.

w.  "Owner" or "Owners" means any Person owning any equity interest in the Borrower whether represented by ownership of stock or membership or partnership interests.

x.  "Permitted Liens" means those liens and encumbrances against the Collateral by Persons not a party hereto or the Lender as shown in Exhibit D attached.

4

y.   "Person" means an individual, a corporation, a limited liability company, a voluntary association, a partnership, a trust, an unincorporated organization or a government or any agency, instrumentality or political subdivision thereof.

z.   "Prime Interest Rate" means the prime interest rate as published in the Wall Street Journal or other publication deemed comparable by the Lender.

aa.   "Promissory Notes" means the Working Capital Line of Credit Promissory Note, the Secondary Working Capital Line of Credit Promissory Note and the Third Working Capital Line of Credit Promissory Note.

bb.   "Secondary Working Capital Line of Credit" means that line of credit loan in the original face amount of Five Hundred Thousand and no/100 Dollars ($500,000.00) which principal amount shall be subject to the borrowing limitations set forth herein.

cc.   "Secondary Working Capital Line of Credit Interest Rate" means the per annum rate of interest to be calculated daily on the then outstanding principal balance on a 360 day a year basis and to be charged by the Lender to the Borrower under the Secondary Working Capital Line of Credit Promissory Note, which Secondary Working Capital Line of Credit Interest Rate shall be, on the unpaid principal balance, the LIBOR Rate plus two and one-half percent (2.50%), as from time to time adjusted.  The Secondary Working Capital Line of Credit Interest Rate on the effective date of this Agreement shall be two and six hundred seventy-five thousandths percent (2.675%) per annum on the unpaid principal balance.

dd.   "Secondary Working Capital Line of Credit Promissory Note" means the Secondary Working Capital Line of Credit Promissory Note in the sum of Five Hundred Thousand and no/100 Dollars ($500,000.00) and all its terms and provisions, in substantially the form of Exhibit B attached hereto, to be delivered by the Borrower to the Lender, on the date hereof which replaces the prior Secondary Working Capital Line of Credit Promissory Note dated March 10, 2014.

ee.   "Secondary Working Capital Line of Credit Termination Date" means the maturity date on the Secondary Working Capital Line of Credit Promissory Note, as may be extended, amended or renewed from time to time at the sole discretion of the Lender, or earlier upon the occurrence of an Event of Default or otherwise as provided herein.  Unless otherwise modified in writing signed by both the Borrower and the Lender, the Secondary Working Capital Line of Credit Termination Date shall be June 10, 2016.

ff.   "Security Agreement" means that Security Agreement by and among the Lender and the Borrower dated the date hereof.

gg.   "Specific Vehicle Inventory" means those trucks or vehicles identified by VIN or other recognized and traceable identification number which are being purchased by the Borrower with each advance under the Working Capital Line of Credit Promissory Note.

hh.   "Specific Crane Inventory" means those cranes identified by VIN or other recognized and traceable identification number which are being purchased by the Borrower with each advance under the Third Working Capital Line of Credit Promissory Note.

ii.     "Subordinated Debt" means the subordinated debt existing as of the date of execution of this Agreement and as fully disclosed to the Lender in Exhibit E attached hereto.

jj.     "Subsidiary" means, with respect to any Person, any entity of which at least a majority of the outstanding shares of stock or membership or partnership interests having the voting power to elect a majority of the Board of Directors of such corporation or otherwise control the financial affairs of the entity is at the time directly or indirectly owned or controlled by the Borrower or one or more of the Subsidiaries of the Borrower, and shall include affiliates of the Borrower as shown in Exhibit F attached.

kk.     "Third Working Capital Line of Credit" means that line of credit loan in the original face amount of Two Million and no/100 Dollars ($2,000,000.00) which principal amount shall be subject to the borrowing limitations set forth herein.

ll.     "Third Working Capital Line of Credit Interest Rate" means the per annum rate of interest to be calculated daily on the then outstanding principal balance on a 360 day a year basis and to be charged by the Lender to the Borrower under the Third Working Capital Line of Credit Promissory Note, which Third Working Capital Line of Credit Interest Rate shall be, on the unpaid principal balance, the LIBOR Rate plus two and one-half percent (2.50%), as from time to time adjusted. The Third Working Capital Line of Credit Interest Rate on the effective date of this Agreement shall be two and six hundred seventy-five thousandths percent (2.675%) per annum on the unpaid principal balance.

mm.     "Third Working Capital Line of Credit Promissory Note" means the Third Working Capital Line of Credit Promissory Note in the sum of Two Million and no/100 Dollars ($2,000,000.00) and all its terms and provisions, in substantially the form of Exhibit C attached hereto, to be delivered by the Borrower to the Lender.

nn.     "Third Working Capital Line of Credit Termination Date" means the maturity date on the Third Working Capital Line of Credit Promissory Note, as may be extended, amended or renewed from time to time at the sole discretion of the Lender, or earlier upon the occurrence of an Event of Default or otherwise as provided herein. Unless otherwise modified in writing signed by both the Borrower and the Lender, the Third Working Capital Line of Credit Termination Date shall be June 10, 2016.

oo.     "UCC" means the version of Article 9 of the Uniform Commercial Code in effect in the State of Illinois, as from time to time amended.

pp.     "Vehicle Collateral" shall include all trucks or vehicles of any kind and identified by VIN or other recognized and traceable identification number in which Borrower has any rights whether now existing or hereafter from time to time acquired.

qq.     "Working Capital Line of Credit" means that line of credit loan in the original face amount of Nine Million Five Hundred Thousand and no/100 Dollars ($9,500,000.00) which principal amount shall be subject to the borrowing limitations set forth herein.

rr.    "Working Capital Line of Credit Interest Rate" means the per annum rate of interest to be calculated daily on the then outstanding principal balance on a 360 day a year basis and to be charged by the Lender to the Borrower under the Working Capital Line of Credit Promissory Note, which Working Capital Line of Credit Interest Rate shall be, on the unpaid principal balance, the LIBOR Rate plus two and one-half percent (2.50%), as from time to time adjusted.    The Working Capital Line of Credit Interest Rate on the effective date of this Agreement shall be two and six hundred seventy-five thousandths percent (2.675%) per annum on the unpaid principal balance.

ss.    "Working Capital Line of Credit Promissory Note" means the Working Capital Line of Credit Promissory Note in the sum of Nine Million Five Hundred Thousand and no/100 Dollars ($9,500,000.00) and all its terms and provisions, in substantially the form of Exhibit A attached hereto, to be delivered by the Borrower to the Lender, on the date hereof which replaces the prior Working Capital Line of Credit Promissory Note dated March 10, 2014.

tt.    "Working Capital Line of Credit Termination Date" means the maturity date on the Working Capital Line of Credit Promissory Note, as may be extended, amended or renewed from time to time at the sole discretion of the Lender, or earlier upon the occurrence of an Event of Default or otherwise as provided herein.   Unless otherwise modified in writing signed by both the Borrower and the Lender, the Working Capital Line of Credit Termination Date shall be June 10, 2016.

Any definitions set forth in the Security Agreement which are contained in this Agreement shall have the definition ascribed in the Security Agreement unless separately defined or inconsistent with the definition contained herein, in which case the definition contained herein shall control.

## 2.    LOANS AND PAYMENT PROVISIONS.

a.    Promissory Notes:  The Borrower shall execute and deliver to the Lender with this Agreement the Promissory Notes.  The Promissory Notes, together with this Agreement and the other documents referred to herein, shall evidence the Borrower's indebtedness to the Lender under this Agreement.

b.    Principal and Interest:

i.    Working Capital Line of Credit Promissory Note.    Borrower requests for advances for Specific Vehicle Inventory shall be repaid as interest-only for fifteen (15) months after the advance is made.  For that fifteen (15) month period following each separate advance interest only shall be paid to Lender on the outstanding daily principal balance of such advance owing on the Working Capital Line of Credit Promissory Note, which interest shall be computed at the close of each day at the Working Capital Line of Credit Interest Rates. Such interest shall be paid monthly in arrears, commencing on April 28, 2015 and continuing on the 28th day of each month thereafter until fifteen (15) months have passed from the advance. After the fifteen month anniversary of the advance, monthly principal and interest payments must be made based on a four (4) year amortization of the then outstanding balance of the advance.  On the twenty-one (21) month anniversary of the advance, the entire outstanding

principal and accrued interest of the advance shall be due and payable in one balloon payment. It is understood and agreed that at no time shall the total financing for items past the fifteen month interest-only period exceed Two Million and no/100 Dollars ($2,000,000.00) and that, on the fifteen (15) month anniversary of any debt which would cause such total financing for items past their interest-only period to exceed Two Million and 00/100 Dollars ($2,000,000.00), Borrower shall tender such amount as is necessary to pay down the debt so that such total indebtedness does not exceed Two Million and no/100 Dollars ($2,000,000.00). It is further understood and agreed that at the time of the sale of any item of Specific Vehicle Inventory, payment shall be tendered to Lender to pay off outstanding principal and accrued interest associated with the advance made for the item sold.

ii.     Secondary Working Capital Line of Credit Promissory Note. The Borrower shall pay interest to the Lender upon the outstanding daily principal balance owing on the Secondary Working Capital Line of Credit Promissory Note, which interest shall be computed at the close of each day, at the Secondary Working Capital Line of Credit Interest Rate. Until the Secondary Working Capital Line of Credit Termination Date, such interest shall be paid monthly in arrears, commencing on April 28, 2015, and continuing on the 28th day of each month thereafter until the Secondary Working Capital Line of Credit Termination Date, at which date the entire outstanding principal and accrued interest shall be payable in one installment.

iii.    Third Working Capital Line of Credit Promissory Note. Borrower requests for advances for Specific Crane Inventory shall be repaid as interest-only for fifteen (15) months after the advance is made. For that fifteen (15) month period following each separate advance interest only shall be paid to Lender on the outstanding daily principal balance of such advance owing on the Third Working Capital Line of Credit Promissory Note, which interest shall be computed at the close of each day at the Third Working Capital Line of Credit Interest Rates. Such interest shall be paid monthly in arrears, commencing on April 28, 2015 and continuing on the 28th day of each month thereafter until fifteen (15) months have passed from the advance. After the fifteen month anniversary of the advance, monthly principal and interest payments must be made based on a four (4) year amortization of the then outstanding balance of the advance. On the twenty-first (21) month anniversary of the advance, the entire outstanding principal and accrued interest of the advance shall be due and payable in one balloon payment. It is understood and agreed that at no time shall the total financing for items past the fifteen month interest-only period exceed Two Million and no/100 Dollars ($2,000,000.00) and that, on the fifteen (15) month anniversary of any debt which would cause such total financing for items past their interest-only period to exceed Two Million and no/100 Dollars ($2,000,000.00), Borrower shall tender such amount as is necessary to pay down the debt so that such total indebtedness does not exceed Two Million and no/100 Dollars ($2,000,000.00). It is further understood and agreed that at the time of the sale of any item of Specific Crane Inventory, payment shall be tendered to Lender to pay off outstanding principal and accrued interest associated with the advance made for the item sold.

iv.     All payments shall be made to the Lender on or before the required due dates in immediately available United States funds.

c.      Borrowing:

       i.      <u>Working Capital Line of Credit Promissory Note</u>.  The Borrower may from time to time request advances under the Working Capital Line of Credit Promissory Note up to an initial amount of Nine Million Five Hundred Thousand and no/100 Dollars ($9,500,000.00), less any amounts previously advanced which remain unpaid at the time of each request.  The Working Capital Line of Credit is a revolving note and any repayment of prior advances will not restrict the Borrower from receiving further advances provided the principal balance does not exceed the amounts allowed herein, or the lesser of amounts available under the Borrowing Base.  The limitations on borrowing set forth herein shall govern notwithstanding the face amount set forth on the Working Capital Line of Credit Promissory Note.

       ii.     <u>Secondary Working Capital Line of Credit Promissory Note</u>.  The Borrower may from time to time request advances under the Secondary Working Capital Line of Credit Promissory Note up to an initial amount of Five Hundred Thousand and no/100 Dollars ($500,000.00), less any amounts previously advanced which remain unpaid at the time of each request.  The Secondary Working Capital Line of Credit is a revolving note and any repayment of prior advances will not restrict the Borrower from receiving further advances provided the principal balance does not exceed the amounts allowed herein, or the lesser of amounts available under the Borrowing Base.  The limitations on borrowing set forth herein shall govern notwithstanding the face amount set forth on the Secondary Working Capital Line of Credit Promissory Note.

       iii.    <u>Third Working Capital Line of Credit Promissory Note</u>.  The Borrower may from time to time request advances under the Third Working Capital Line of Credit Promissory Note up to an initial amount of Two Million and no/100 Dollars ($2,000,000.00), less any amounts previously advanced which remain unpaid at the time of each request.  The Third Working Capital Line of Credit is a revolving note and any repayment of prior advances will not restrict the Borrower from receiving further advances provided the principal balance does not exceed the amounts allowed herein, or the lesser of amounts available under the Borrowing Base.  The limitations on borrowing set forth herein shall govern notwithstanding the face amount set forth on the Third Working Capital Line of Credit Promissory Note.

       iv.    <u>Requests for Advances</u>.  Requests for advances may be either written or oral, including a request made by telephone.  In the case of an oral request, the Lender is authorized to make such requested advance and to rely upon the authority of the person making the request, unless the Borrower directs the Lender, in writing, not to honor oral requests except from certain identified persons.  The authority of the person requesting the advance shall be conclusively deemed authorized by the Borrower.  No request shall be approved unless and until the Borrower is in full compliance with all terms and conditions of this Agreement.

       v.     Unless directed otherwise by the Borrower, loan advances shall be credited to an account of the Borrower at the Lender.

       d.     <u>Debits</u>:  The Lender shall enter as debits to the Loan Account all loans and/or advances made pursuant to the Credit Agreements, and Interest and Charges in accordance with the Credit Agreements.  The Lender shall enter as credits to the Loan Account all payments made by the Borrower on account of indebtedness evidenced by the Loan Account,

all net proceeds of Collateral which are finally paid to Lender in cash or solvent credits, and other appropriate credits. The debit balance of the Loan Account shall reflect the amount of indebtedness of the Borrower from time to time by reason of loans and other appropriate charges under this Agreement.

   e. <u>Authorization of Loan Advances</u>: The Borrower shall be obligated to pay all loan advances notwithstanding the fact that an advance was not (or may not have been) properly authorized.

   f. <u>Borrowing Base Excess</u>: If at any time the sum of the debit balance of the Loan Account maintained for the Working Capital Line of Credit Promissory Note, Secondary Working Capital Line of Credit Promissory Note or Third Working Capital Line of Credit Promissory Note exceeds the amount allowable pursuant to the then current Borrowing Base, at the option of the Lender, the Borrower shall (i) pledge, assign and transfer to the Lender such additional collateral as the Lender shall request or (ii) pay cash to the Lender to be credited against the Working Capital Line of Credit Promissory Note, Secondary Working Capital Line of Credit Promissory Note or Third Working Capital Line of Credit Promissory Note, in an amount sufficient to eliminate any excess.

   g. <u>Application of Credits</u>: All payments received by the Lender which are not directed to a specific Promissory Note and all proceeds of Collateral received by the Lender shall be applied first to the payment of Interest and Charges and the balance, if any, to the principal balances owing on the Promissory Notes on a pro-rata basis or on any basis determined by the Lender in its sole discretion. The Borrower authorizes the Lender to charge the Interest and Charges to the Loan Account or to any deposit account maintained by the Borrower with the Lender.

   h. <u>Determination of Balances</u>: The records of the Lender as shown by the Loan Account shall be prima facia evidence as to the amounts of advances, outstanding principal balance, and accrued Interest and Charges.

   i. <u>Prepayments</u>: There shall be no penalty for prepayment.

   **3.** **CONDITIONS PRECEDENT TO INITIAL AND SUBSEQUENT LOANS.** The Borrower shall have satisfied each of the following conditions and delivered to the Lender the following documents and instruments in form and substance acceptable to the Lender prior to the making of each advance under the Working Capital Line of Credit Promissory Note, Secondary Working Capital Line of Credit Promissory Note or Third Working Capital Line of Credit Promissory Note by the Lender hereunder:

   a. <u>Representations and Warranties</u>. All of the representations and warranties of the Borrower set forth in this Agreement shall be true and correct in all material respects as of the date hereof and on the date of each subsequent advance.

   b. <u>No Defaults</u>. The Borrower shall be in compliance in all material respects with the terms and conditions of this Agreement (and all other Credit Agreements) and no Event of Default shall have occurred and be continuing, and no event shall have occurred (or failed to

10

have occurred) which, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

   c. <u>No Adverse Changes</u>.  The Borrower has not incurred a Material Adverse Change (as defined in the Security Agreement) in its assets or financial condition since the date of this Agreement.  In the event any Material Adverse Change occurs the Borrower shall notify the Lender within two (2) business days of its knowledge of the change.

   d. <u>Deposits</u>.  The Borrower shall have continuously maintained all its primary operating and deposit accounts with the Lender.

   e. <u>Delivery of Documents</u>.  The Borrower shall have delivered the following documents to the Lender:

    (1) <u>Certificate of Resolutions</u>.  Certificates of appropriate officers of the Borrower that include copies of resolutions of the Members and Managers (and the stockholders, if applicable) or any other governing body or group that authorize (i) the execution, delivery and performance of this Agreement, and all Credit Agreements, and (ii) the transactions contemplated by this Agreement; the certificate shall also identify the officer, officers or agents who are authorized to (i) sign the Credit Agreements and (ii) make requests for loan advances; the certificate shall be dated and delivered as of the effective date of this Agreement and shall confirm that all such resolutions remain in full force and effect;

    (2) <u>Financing Statements</u>.  Such financing statements (as defined in the UCC) as may be reasonably requested by Lender necessary to perfect the security interest of Lender in the Collateral.  Borrower authorizes the filing and amending of such financing statements by Lender in any jurisdiction.  Borrower further agrees that Lender may and gives authority to the Lender to prepare and file such financing statements and amendments as it deems appropriate;

    (3) <u>Insurance Policies</u>.  Copies of all insurance policies or certificates that insure any portion of any of the Collateral;

    (4) <u>Promissory Notes</u>.  The fully executed Promissory Notes;

    (5) <u>Guaranty</u>.  The fully executed guaranty of the Guarantor in substantially the form attached as Exhibit G attached hereto.

    (6) <u>Borrowing Base Certificate</u>.  A duly executed Borrowing Base Certificate to be delivered and dated as of a date that is acceptable to the Lender and available from the Borrower's records.

    (7) <u>Invoice and Purchase Documents.</u>  Copies of any and all invoices and/or purchase documents evidencing the purchase or proposed purchase of Specific Vehicle Inventory or Specific Crane Inventory or for the purchase or proposed purchase of truck parts or crane parts for which an advance is requested.

(8)     Assignment of Life Insurance.  Fully executed Assignment of Life Insurance policy as needed to assign policy #000312120 issued by Pekin Life insuring the life of Erik Jones in the sum of $5,000,000.00.

(9)     Other Documents. Such other documents or instruments as the Lender shall reasonably request, including, but not limited to, any documents creating or evidencing Borrower's ownership of (such as certificates of title) or security interest in the Collateral;

f.     Quarterly Inspections.  Borrower shall assist Lender or Lender's agent in making quarterly inspections of the Collateral, inventory, Specific Vehicle Inventory and Specific Crane Inventory at any of Borrower's facilities as Lender deems necessary.

**4.     COLLATERAL.**  As security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Obligations, the Borrower pledges and grants to the Lender a security interest in the Collateral as defined in and subject to the terms and conditions of the Security Agreement.

**5.     REPRESENTATIONS AND WARRANTIES.**     As a material inducement to the Lender to make loans to the Borrower under this Agreement, the Borrower makes the following additional representations and warranties to the Lender.     Such representations and warranties shall survive during the term of this Agreement and so long after the term of this Agreement as any Obligations remain outstanding.

a.     Standing.  Borrower is existing as an entity in good standing under the laws of the state of its organization as set forth in the opening paragraph of this Agreement and is duly qualified in those jurisdictions where the conduct of its business or the ownership of its properties requires qualification.

b.     Powers and Authority.  Borrower has the power and authority to (i) own its property and assets, (ii) conduct its business, (iii) enter into and perform this Agreement and the Credit Agreements, and (iv) incur the Obligations.

c.     Trade Names, Business Changes.  Except as listed on Exhibit H, Borrower has utilized no trade names in the conduct of its business, and has not changed its name, been the surviving entity in a merger, acquired any business or changed the location of its state of organization.

d.     No Defaults.  Borrower is not in default with respect to any agreement to which it is a party or by which it is bound.  The execution and performance of this Agreement and any Credit Agreements will not:

(1)     violate or result in a default or, except as specifically provided in this Agreement, in the creation or imposition of any lien or encumbrance upon any of the assets of Borrower (immediately, with the passage of time, or with the giving of notice and the passage of time) under any other contract, agreement or instrument to which a Borrower is a party or by which a Borrower is bound;

(2)     result in the acceleration of any obligation under any mortgage, lien, lease, franchise, license, permit, agreement, instrument, order, arbitration award, judgment, or decree;

(3)     result in the termination of any license, franchise, lease, or permit, to which the Borrower is a party or by which it is bound; or

(4)     violate or conflict with any other restriction of any kind or character to which the Borrower is subject.

e.      Authorization, Binding Effect.  This Agreement, all Credit Agreements delivered as of the effective date of this Agreement, and all subsequent Credit Agreements have been or will have been duly authorized and/or executed and delivered, as appropriate, and constitute valid and legally binding obligations of the Borrower and are or will be enforceable against the Borrower in accordance with their respective terms.

f.      No Claims.  There is no claim, loss contingency, litigation, or proceeding whether or not pending, threatened, or imminent against or otherwise affecting the Borrower which involves the possibility of any judgment or liability which may result in a Material Adverse Change in the business, properties, or condition, financial or otherwise, of the Borrower. To the extent permitted by applicable law, the Borrower will notify the Lender of any litigation or governmental or regulatory proceedings that will (i) cause losses to the Borrower, or (ii) impair the value of the Borrower's assets, by a total amount that exceeds One Hundred Thousand and no/100 Dollars ($100,000.00).  Such notice shall be given within three business days after the Borrower obtains knowledge sufficient to provide the basis for a belief that the total amount will or may exceed One Hundred Thousand and no/100 Dollars ($100,000.00).

g.      Collateral.  The Borrower is the owner of or has a security interest in the Collateral, free and clear of all other security interests, encumbrances, or liens excepting those Permitted Liens set forth in Exhibit D.  The Borrower will defend the Collateral against all claims and demands of all persons at any time claiming an interest therein. Borrower will immediately deliver original title certificate or other certificate or documentation of ownership to Lender for vehicles financed by an advance.

h.      Properties.  The Borrower is the owner of its properties, free and clear of all security interests, encumbrances or liens, except (i) liens in favor of the Lender, (ii) real estate or special improvement assessment liens which may arise by operation of law with respect to obligations of the Borrower which are not yet due and payable, and (iii) Permitted Liens as set forth in Exhibit D.  The Borrower will defend its properties against all claims and demands of all persons at any time claiming an interest therein.

i.      Financial Statements.  The financial statements furnished to the Lender by the Borrower are complete and accurate representations of the financial condition of the Borrower as of the respective dates thereof, and have been prepared on a consolidated basis where appropriate and in accordance with GAAP.  Since the respective dates of the financial statements there has been no Material Adverse Change in the financial condition of the Borrower

and there has been no transaction other than in the ordinary course of the business of the Borrower which is reasonably likely to have a Material Adverse Effect.

j.      Offices.   The address of the chief executive officer and chief place of business of the Borrower is:

> Erik Jones
> 20490 E. 550[th] Street
> Colona IL 61241

All records pertaining to the Collateral (including computer records) are kept at the Borrower's chief place of business.

k.      Taxes.   The Borrower has filed all material federal, state, and local tax returns and other reports it is required to file (to the best of its knowledge and after making a duly diligent inquiry as to filing requirements) and has paid or made adequate provision for payment of all such taxes, assessments, and other governmental charges.

l.      Compliance.   The Borrower has complied in all material respects with all applicable statutes, regulations, ordinances, court decrees, or other directives of the United States of America, and all states, counties, municipalities, and agencies with respect to the conduct of its business.

m.      Consents, Approvals.   No consent or approval of any Person, no waiver of any lien or other similar right, and no consent, license, approval, authorization, or declaration of any governmental authority, bureau or agency is or will be required in connection with the execution, delivery, performance, validity or enforcement or priority of this Agreement or any Credit Agreements.

n.      Use of Property.   None of the property of the Borrower has been used as a Hazardous Substance disposal site, as a landfill or a dump.

o.      Full Disclosure.   This Agreement and the Credit Agreements delivered to the Lender do not contain any known untrue statement of a material fact or omit to state a known material fact necessary in order to make the statements contained herein or therein not misleading.   There is no known material fact (other than general economic conditions or facts or information available to the public generally) that has not been disclosed in writing to the Lender that materially adversely affects, or as far as the Borrower can now reasonably foresee, may materially adversely affect, the business, operations, properties or assets of the Borrower or the ability of the Borrower to perform its obligations under any Credit Agreements.

p.      Hazardous Substances.   No Hazardous Substance or toxic substance which is above any levels requiring reporting to any governmental body has been stored, used or disposed of on any property in which the Borrower holds a real estate interest without prior disclosure to Lender.

q.      No Subsidiaries.   The Borrower does not own any Subsidiaries excepting those shown on Exhibit F attached hereto.

6.      **NEGATIVE COVENANTS.**  The Borrower agrees that during the term of this Agreement and so long thereafter as any Obligations remain outstanding, the Borrower will not:

a.      Organizational Changes.  Enter into any merger or consolidation or effect any reorganization or recapitalization or create any Subsidiary without thirty (30) days prior notice to the Lender.

b.      Liens and Transfers.  Transfer, sell, lease, mortgage, pledge, grant or permit to exist a security interest in, or lien or encumbrance upon, any of the Collateral except (i) liens in favor of Lender; (ii) liens arising by operation of law with respect to obligations of the Borrower not yet due and payable; (iii) transfers in the ordinary course of business or where Specific Inventory is sold and appropriate payment made to Lender; (iv) Permitted Liens or (v) liens and transfers of less than One Hundred Thousand and no/100 Dollars ($100,000.00) in the aggregate which are junior and inferior to the Lender's security interest without the prior written consent of the Lender, which consent shall not be unreasonably withheld by the Lender.

c.      Third Party Liabilities.  Assume, endorse, guarantee, or otherwise become liable for or upon the obligations of any Person or other entity (other than endorsements for deposit in the ordinary course of business) in excess of One Hundred Thousand and no/100 Dollars ($100,000.00) in the aggregate without the prior written consent of the Lender, which consent shall not be unreasonably withheld by the Lender.

d.      Borrower's Liabilities.  Incur, create, assume or permit to exist any indebtedness or liability for borrowed money except:  (i) indebtedness to the Lender; (ii) accounts payable; (iii) leases incurred in the ordinary course of business; (iv) indebtedness or liability of less than One Hundred Thousand and no/100 Dollars ($100,000.00) in the aggregate; (v) Permitted Liens; and (vi) indebtedness owing under the Subordinated Debt without the prior written consent of the Lender, which consent shall not be unreasonably withheld by the Lender.

e.      Investments.  Except in conjunction with the transfer of funds for payment of taxes by the shareholders of the Borrower due to Sub-Chapter S status, make any further investments in, or make any loan, or any advance outside the regular course of business, to any Person including officers, stockholders or directors of the Borrower in excess of One Hundred Thousand and no/100 Dollars ($100,000.00) in the aggregate without the prior written consent of the Lender, which consent shall not be unreasonably withheld by the Lender.

f.      Disposal of Assets.  Enter into any sale-leaseback transaction, or sell, lease, transfer or otherwise dispose of all or any substantial portion of its assets without thirty (30) days prior written notice to the Lender, except that the Borrower may sell inventory in the ordinary course of business.  Any sale of Collateral outside the normal course of business will require the prior written consent of the Lender, which consent shall not be unreasonably withheld by the Lender.

g.      Changes in Business.  Make or permit any substantial change in, or materially cease in whole or in part, its present business, or engage in any other material

activities apart from its present business without thirty (30) days prior written notice to the Lender.

        h.     Ownership. In no event shall the Borrower or Guarantor permit Guarantor to maintain less than a majority interest in Borrower without the prior written consent of the Lender, which consent shall not be unreasonably withheld by the Lender.

        i.     Material Adverse Changes. Make or permit any Material Adverse Change, as determined by the Lender in its sole discretion, in its assets or financial condition.

        j.     Subordinated Debt. Make a payment of interest owing on Subordinated Debt unless and until the Borrower is in full compliance with all terms and obligations contained in this Agreement. At no time shall any principal be paid on Subordinated Debt without the prior written consent of the Lender, which consent shall not be unreasonably withheld by the Lender.

        k.     Distributions for Taxes. Make any Distribution to any Owner (and in the aggregate with more than one Owner) in excess of that amount for income tax obligations of any Owner arising from the Borrowers status under Sub-Chapter S of the United State Internal Revenue Code, as reasonably calculated for each tax year of any such Owner.

        **7.**     **AFFIRMATIVE COVENANTS.** The Borrower agrees that during the term of this Agreement and so long as any Obligations remain outstanding, it will:

        a.     Financial Information. Provide Lender with:

        (1)     Annual Statements of Borrower. Accountant prepared and reviewed financial statements on Borrower, within one hundred twenty (120) days after the last day of each fiscal year of Borrower, prepared in reasonable detail and in accordance with GAAP, by an independent certified public accountant satisfactory to the Lender, with such statements to include a balance sheet and related statements of income, retained earnings, and changes in financial position;

        (2)     Annual Corporate Tax Returns. Annual corporate tax returns of Borrower within thirty (30) days of filing;

        (3)     Quarterly Statements. Company prepared financial statements for Borrower within thirty (30) days of the end of each quarter prepared in reasonable detail with such statements to include a balance sheet and related statements of income, related earnings, and changes in financial position;

        (4)     Monthly Reporting. Monthly aged inventory report on the complete Borrower inventory within five (5) days after the last day of each month showing all items of inventory and each items inventory age, all to be in form and substance satisfactory to the Lender. Specific Inventory shall be listed by VIN and location in addition to the aged report.

        (5)     Borrowing Base Certificates. Borrowing Base Certificates shall be submitted monthly on the 20th day of each month to Lender on the form attached as

Exhibit I for the Working Capital Line of Credit, Exhibit J for the Secondary Working Capital Line of Credit, and Exhibit K for the Third Working Capital Line of Credit.

(6)   Guarantor Information.   Annual federal and state income tax returns within thirty (30) days of filing along with annually updated financial statements of the Guarantor, such financial statements to be in form and substance satisfactory to the Lender.

(7)   Insurance Premiums.   Notification to the Lender of any notices of cancellation of any insurance within three (3) days of receipt and prior to cancellation.

(8)   Other Information.  Such other information, in form and satisfactory to the Lender, as the Lender may from time to time reasonably request.

b.   Monthly Meetings.  Meet with the Lender each month (with those officers or agents of the Borrower requested by the Lender to be in attendance) to discuss all financial information of the Borrower at Lender's discretion.

c.   Insurance.   Maintain casualty insurance coverage on the Borrower's physical assets and other insurance against other risks, in such amounts and of such types and, in any event, not less than as are ordinarily carried by similar businesses or as reasonably required by the Lender in its sole discretion.  In the case of all policies insuring property in which the Lender shall have a security interest of any kind whatsoever, all such insurance policies shall provide that the proceeds thereof shall be payable to the Borrower and the Lender, as their respective interest may appear and at the request of the Lender name the Lender as a loss payee for the Collateral (whether owned by the Borrower or any Assignor under the Security Agreement).  All said policies or certificates thereof, including all endorsements thereof and those required hereunder, shall be deposited with the Lender, if the Lender has exercised its option to become a named loss payee.  Such policies shall contain provisions that no such insurance may be canceled or decreased without thirty (30) days prior written notice to the Lender.  In the event of acquisition of additional property, real or personal, or of incurrence of additional risks of any nature, the Borrower shall cause such insurance coverage to be increased or amended in such manner and to such extent as prudent business judgment would dictate.  If the Borrower shall at any time or times hereafter fail to obtain and maintain any of the policies of insurance required herein, or fail to pay any premium in whole or in part relating to any such policies, the Lender may, but shall not be obligated to, obtain and/or cause to be maintained insurance coverage with respect to the assets of the Borrower, including, at the Lender's option, the coverage provided by all or any of the policies of the Borrower and pay all or any part of the premium thereunder, without waiving any Event of Default by the Borrower, and any sums disbursed by the Lender shall be additional Obligations of the Borrower to the Lender payable on demand.  The Lender shall have the right to settle and compromise any and all claims under any of the policies required to be maintained by the Borrower hereunder; to demand, receive, and receipt for all moneys payable thereunder; and to execute in the name of the Borrower or the Lender or both any proof of loss, notice, or other instruments in connection with such policies or any loss thereunder.

Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the Collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the Collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by its agreement. If Lender purchases insurance for the Collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on Borrower's own.

d.     Collateral.     Maintain Collateral which is tangible property in good condition and repair, defend at the Borrower's expense all Collateral from all adverse claims, not use any of the Collateral for any illegal purpose and cause to be kept current all premiums due on any insurance.

e.     Inventory Days.     Restrict inventory days, determined by taking total inventory divided by cost of goods sold over the same period of time as shown in the Borrower's financial statements times 365, to a maximum of 250 during each fiscal year, beginning at 2015. Initial test to be completed as of December 31, 2015 and to be completed thereafter as may be requested by Lender.

f.     Examinations.     Permit the Lender, through its authorized attorneys, accountants, and representatives, to examine the accounts and inventory and the books, accounts, records, ledgers, and assets of every kind and description of the Borrower at all reasonable times, upon reasonable notice.

g.     Notice of Defaults.     Promptly notify the Lender in writing of any condition or event which constitutes, or could constitute with the passage of time or giving of notice or both, a default under this Agreement, and promptly inform the Lender of any events or changes in the business, properties, or condition, financial or otherwise, of the Borrower, which individually or cumulatively when viewed in light of prior financial statements, may result in a Material Adverse Change in the financial condition of the Borrower.

h.     Corporate Changes.     Notify the Lender in writing not less than thirty (30) days prior to (i) the change of the Borrower's name or use of any trade names; (ii) any change in the address of the chief executive office and/or chief place of business of the Borrower; or (iii) the change of the state of organization of the Borrower.

i.     Books and Records.     Keep complete and accurate books and records with respect to the business of the Borrower and the Collateral consistent with good business practice including current stock, cost, and sales records of inventory, accurately itemizing and describing the kinds, types, and quantities of inventory, and the cost and selling price thereof.

j.      Instruments.  At any time and from time to time upon request of the Lender, execute and deliver to the Lender, in form and substance satisfactory to the Lender, negotiable promissory notes for any or all of the Obligations and/or such documents in respect of the Obligations as the Lender shall deem necessary or desirable to evidence the Obligations or perfect or maintain perfected security interest of the Lender in the Collateral or which may be necessary to comply with the provisions of the law of the State of Illinois or the law of any other jurisdiction in which the Borrower may then be conducting business or in which any of the Collateral may be located.

k.      Subsidiaries.  At the request of the Lender, the Borrower will promptly cause such Subsidiary to:

(1)      become a co-maker by executing and delivery to the Lender of such documents as the Lender may require;

(2)      secure all Obligations with a first lien (subject to Permitted Liens) upon the types of Collateral described in the Security Agreement owned by the Subsidiary;

(3)      deliver to the Lender all documents necessary to perfect any security interest required under this Agreement, the Security Agreement or the Credit Agreements;

(4)      provide the Lender with such other documents or instruments as Lender shall reasonably request, including obligating itself to all of the terms and conditions of the Agreement; and

(5)      subordinate all debt owing by Borrower to the Subsidiary or to Borrower by the Subsidiary to the Obligations owing Lender.

l.      Compliance with Environmental Laws.  The Borrower will comply, and cause each Subsidiary to comply, with all applicable environmental, hazardous waste or substance, toxic substance and underground storage laws and regulations and will obtain any permits, licenses, or buildings, improvements, fixtures, equipment or property required by reason of any applicable environmental, hazardous waste or substance, toxic substance or underground storage laws or regulations.  The Borrower shall exercise due diligence in determining the applicability of the above laws and regulations and shall take the necessary steps to comply with such laws and regulations within a reasonable period of time after discovering any violations of such laws and statutes.

m.      Primary Deposits.  Maintain the Borrower's and cause its Subsidiaries to maintain their primary operating and deposit accounts with the Lender.

**8.      FINANCIAL COVENANTS**.  So long as the Obligations shall remain unpaid or the Lender shall have any commitment under this Agreement, the Borrower will:

a.      Fixed Charge Coverage Ratio.  Maintain a Fixed Charge Coverage Ratio of 1.20 to 1.00 measured at the last day of each quarter of the Borrower and defined as the total of EBITDA minus unfinanced capital expenditures minus withdrawals plus member

contributions divided by all debt payment obligations (all debt payment obligations as used in the ratio shall be a total of all accumulated interest plus regularly scheduled debt payments plus any additional payments required as a result of scheduled reduction(s) to lending commitments to be determined on Borrower's trailing 12 months).

      b.    <u>Maximum Debt to Tangible Net Worth Ratio</u>.  Maintain a Maximum Debt to Tangible Net Worth Ratio of not more than 3.50 to 1:00 measured at the last day of each quarter of the Borrower.

      c.    <u>Inventory.</u>  At no point will units of inventory with purchase prices of Fifty Thousand and no/100 Dollars ($50,000.00) or more comprise more than thirty-five percent (35%) of the inventory of the Borrower.  Borrower shall notify Lender of each and every purchase of any inventory item with a purchase price of Fifty Thousand and no/100 Dollars ($50,000.00) or more, whether financed by Lender or not.  Any improvements to Specific Vehicle Inventory, Specific Crane Inventory or other units of inventory shall not exceed Ten Thousand and no/100 Dollars ($10,000.00) in total costs without Lender's prior written approval.

      d.    Each quarter certify in writing signed by an officer or agent of the Borrower who is approved by the Lender that all financial covenants have been met.

    **9.**    **<u>EVENTS OF DEFAULT AND ACCELERATION</u>.**  The occurrence of any one or more of the following events by the Borrower, shall constitute an Event of Default under this Agreement (each an "<u>Event of Default</u>").

      a.    <u>Payments</u>.  Failure to pay any principal, interest, or other charges in respect of any of the Obligations within ten (10) business days after receipt of written notice from the Lender that such amounts are owing as of the date due.

      b.    <u>Covenants</u>.  Default in the observance or performance of any material covenant or agreement of the Borrower as set forth in this Agreement, the Credit Agreements, or any other document (whether signed prior to or subsequent to the effective date of this Agreement and which specifically includes any promissory note and related documents at any time executed in favor of the Lender whether related or unrelated to the Promissory Notes executed pursuant to this Agreement) signed by the Borrower in favor of the Lender, and the same has not been cured by the Borrower within ten (10) business days after receipt of written notice from the Lender of such default.

      c.    <u>Representations</u>.  If any representation, warranty, certificate, schedule, or other information made or furnished by the Borrower in any Credit Agreement is or shall be untrue or misleading in any material respect.

      d.    <u>Third Party Obligations</u>.  Default in any obligation for the payment of money to a third party, in an amount that exceeds One Hundred Thousand and no/100 Dollars ($100,000.00), for which the Borrower has not provided within ten (10) business days after failing to make such payment a basis acceptable to Lender for contesting the making of the payment.

e.  Losses.  Loss, theft, damage or destruction of any substantial portion of the Collateral for which there is either no insurance coverage or for which, in the opinion of the Lender, there is insufficient insurance coverage, or the making of any levy, seizure or attachment upon the Collateral or upon any substantial portion of other property of the Borrower by any third party.

f.  Insolvency.  Insolvency of the Borrower or if a creditors' committee is appointed for the business of the Borrower; or if the Borrower makes an assignment for the benefit of creditors, or is adjudicated bankrupt, or if a petition in bankruptcy or for reorganization or to effect a plan or arrangement with creditors is filed by or against the Borrower; or if the Borrower applies for or permits the appointment of a receiver or trustee for any of its property or assets or if any such receiver or trustee is appointed for any of its property or assets; or if any of the above actions or proceedings whatsoever are commenced by or against the Borrower or any other party liable for any of the Obligations.

g.  Dissolution.  If a proceeding is filed or commenced by or against the Borrower for dissolution or liquidation; or if the Borrower voluntarily or involuntarily dissolve or is dissolved, terminates or is terminated, unless the Borrower gives written notice to the Lender within ten (10) days of obtaining knowledge thereof and states what actions acceptable to the Lender are or will be taken to remedy or avoid such dissolution, liquidation or termination.

h.  Prohibition on Business.  If the Borrower is permanently enjoined, restrained or in any way prevented by court or administrative order from conducting all or any material part of its business affairs.

i.  General Insecurity.  If the Lender deems itself insecure based upon a reasonable belief that the value of the Collateral is impaired to such an extent that upon liquidation insufficient value remains for the payment of all Obligations.

j.  Death of Guarantor.  Without waiving any of the Lender's rights under this Section 9, the death of Guarantor and the subsequent transfer of any equity interest owned by him in the Borrower shall not constitute an Event of Default unless and until within six (6) months from the date of death of Guarantor (i) the Lender, the Borrower and the personal representative of Guarantor fail to reach a written agreement regarding the payment of the obligations, or (ii) a written guaranty is not provided to the Lender which replaces Erik Jones as a Guarantor upon terms and conditions acceptable to the Lender in all respects.  Nothing provided herein shall prohibit Lender from filing a claim in probate in the Guarantor's Estate prior to or after six (6) months from the date of death of Guarantor.

If any Event of Default shall occur, then or at any time thereafter, while such Event of Default shall continue, the Lender may declare all Obligations to be due and payable at once and in their entirety, without notice of dishonor, protest, presentment, or demand for payment, all of which are hereby expressly waived by the Borrower.

The Lender acknowledges the Borrower's loans with Central Bank Illinois will be paid off simultaneously with the funding of the loans contemplated herein.  The existence of

Central Bank Illinois's current loans and security interest shall not constitute an Event of Default.

      **10.**    **RIGHTS AND REMEDIES.**  The Lender shall have all of the following rights and remedies upon the occurrence of an Event of Default, along with all other rights and remedies granted under the law or any of the other Loan Documents. However, the Lender shall be under no obligation or duty to exercise any of the powers hereby conferred upon it. The Lender shall be without liability for any act or failure to act in connection with any of its powers and rights. The Lender shall not be bound to take any steps necessary to preserve rights in any Collateral against prior parties.

      a.    Acceleration.  If any Event of Default shall occur, then or at any time thereafter, which such event of Default shall continue, the Lender may declare all Obligations to be due and payable, without notice, protest, presentment, or demand, all of which are hereby expressly waived by the Borrower.

      b.    Premises.  The Lender shall have the right to enter and/or remain upon the premises of the Borrower without any obligations to pay rent to such Borrower or others, or any other place or places where any of the Collateral is located and kept and:  (i) remove Collateral therefrom to the premises of the Lender or any agent of the Lender, for such time as the Lender may desire, in order to maintain, collect, sell and/or liquidate the Collateral or; (ii) use such premises, together with materials, supplies, books and records of the Borrower, to maintain possession and/or the condition of the Collateral, and to prepare the Collateral for sale, liquidation or collection. The Lender may require the Borrower to assemble the Collateral and make it available to Lender at a place to be designated by the Lender which is reasonably convenient to all parties.

      c.    Setoff.  The Lender shall have a right to setoff, without notice to the Borrower, any and all deposits or other sums at any time or times credited by or due from Lender to the Borrower, whether in a special account or other account or represented by a Certificate of Deposit (whether or not matured), which deposits and other sums shall at all times constitute additional security for the Obligations and may be setoff at any time against all or any part of the Obligations whether or not they are then due and whether other security held by the Lender is deemed by it to be adequate.

      d.    Uniform Commercial Code Rights.  The Lender shall have, in addition to any other rights and remedies contained in the Loan Documents, all the rights and remedies of a secured party under the UCC as of the date of this Agreement or as from time to time amended, all of which rights and remedies shall be cumulative, and non-exclusive, to the extent permitted by law.

      e.    Notice of Sale.  Any notice required to be given by the Lender of a sale or other disposition or other intended action by the Lender with respect to any of the Collateral, or otherwise, made in accordance with the terms of this Agreement at least fourteen (14) days prior to such proposed action, shall constitute fair and reasonable notice to the Borrower of any such action. The net proceeds realized by the Lender upon any such sale or other disposition, after deduction of the expenses of retaking, holding, preparing for sale, selling, or the like and

22

reasonable attorneys' fees and other expenses incurred by the Lender, shall be applied toward satisfaction of the Obligations hereunder. The Lender shall account to the Borrower for any surplus realized upon such sale or other disposition and the Borrower shall remain liable for any deficiency. The commencement of any action, legal or equitable, shall not affect the security interest of the Lender in the Collateral until the Obligations hereunder or any judgment therefor are fully paid.

    f.  Waiver of Bond. If the Lender seeks to take possession of any or all of the Collateral by court process, the Borrower hereby irrevocably waives any bonds and any surety or security relating to the Collateral required by any statute, court rule or otherwise as an incident to such possession, and waives any demand for possession prior to the commencement of any suit or action to recover with respect to Collateral.

    **11.**  **TERM OF AGREEMENT.**  The term of this Agreement shall commence on the date of Agreement and shall continue in full force and effect until all Obligations shall have been fully paid and satisfied. No termination shall affect in any way the duties of the Borrower hereunder or the security interest of the Lender in the Collateral if any Obligations are outstanding. The Lender shall retain the security interest, lien and rights granted to it hereunder until all the Obligations are paid in full and satisfied.

    **12.**  **TRANSFERS AND ASSIGNMENTS.**  The provisions of this Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the Lender and the Borrower, subject to the following provisions:

    a.  Lender's Right to Assign. Without any requirement that the Borrower's consent be obtained, the Lender shall have the right to assign, sell, or otherwise transfer all (or any portion) of its rights and security under this Agreement. Such transfers shall be made on such terms and conditions as the Lender may determine in its sole discretion. Such transfers (except in the case of participations) shall have the effect of releasing the Lender from all liability with respect to the transferred interest. The Borrower agrees that the assignee shall have all the rights with respect to the transferred interest that the Lender had prior to the transfer.

    b.  Participations. The Lender may sell participations in the Promissory Notes. In the case of such transfers, the Lender shall not be released from its obligations with respect to such transferred interest.

    c.  Information. The Borrower agrees that the Lender may furnish information to any proposed assignee or participant. For the purposes of this paragraph, "Information" shall mean copies of any Credit Agreements, information or documents provided to Lender in connection with this Agreement or transaction contemplated by this Agreement, and any other documents or information that are related, directly or indirectly, to this Agreement or the transaction contemplated by this Agreement.

    d.  Borrower's Right to Assign. The Borrower may not assign any of its rights or delegate any of their obligations under this Agreement without the prior written consent of the Lender, which consent shall be given in the sole discretion of the Lender.

    **13.**  **GENERAL PROVISIONS.**

a.    No Waiver.  The failure of the Lender at any time to require strict performance by the Borrower of any of the provisions, warranties, terms, and conditions in this Agreement, any Credit Agreement, or other document (whether signed prior to or subsequent to the effective date of this Agreement) signed by the Borrower in favor of the Lender, shall not waive affect, or diminish any right of the Lender at any subsequent time to demand strict performance.  No rights of the Lender under this Agreement shall be deemed to have been waived by any act or knowledge of the Lender, its agents, officers or employees, unless such waiver is contained in an instrument in writing signed by an officer of the Lender.  No waiver by the Lender of any of its rights shall operate as a waiver of any other of its rights or any of its rights on a future occasion.

b.    Notice.  Any demand or notice required or permitted to be given hereunder shall be (i) personally delivered by courier, or (ii) sent by overnight air express service to the address shown below, or (iii) sent by telecopier to the FAX number shown below.

If to Lender or Agent:

By courier or overnight service:

First Midwest Bank
Attn: Drew E. Lawrence
506 15th Street
Moline IL  61265
Telephone:  (309) 797-7601
Telecopier:  (309) 797-7588

With copies to:

Catherine E. Hult
Lane & Waterman LLP
220 North Main Street, Suite 600
Davenport IA  52801
Telephone:  (563) 324-3246
Telecopier:  (563) 324-1616

If to Borrower:

By courier or overnight service:

I80 Equipment, LLC
20490 E. 550th Street
Colona IL 61241
Attn:  Erik Jones
Telephone No.:  (309) 949-3701
Telecopier No.:  (309) 949-3760

24

With copies to:

> Douglas R. Lindstrom, Jr.
> Lane & Waterman LLP
> 220 North Main Street, Suite 600
> Davenport IA 52801
> Telephone No.: (563) 324-3246
> Telecopier No.: (563) 324-1616

c.      Entire Agreement and Modification. This Agreement and the other Credit Agreements constitute the entire agreement between the parties. No modification or amendment of this Agreement shall be effective unless in writing and signed by both parties. This Agreement replaces any and all prior agreements between the parties.

d.      Severability. If any portion of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision, it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

e.      Fees. If at any time the Lender employs consultants or legal counsel (i) to commence, defend or intervene, file a petition, complaint, answer, motion or other pleadings, (ii) to take any other action in or with respect to any suit or proceeding (bankruptcy or otherwise) relating to this Agreement, any Credit Agreement, the Collateral, or any other document (whether signed prior to or subsequent to the effective date of this Agreement) signed by the Borrower in favor of the Lender, (iii) to protect, collect, lease, sell, take possession of or liquidate any of the Collateral, (iv) to attempt to enforce or to enforce any security interest in any of the Collateral, (v) to enforce any rights of the Lender with respect to the Borrower or any Credit Agreement, whether before or after the occurrence of any Event of Default, or (vi) to collect any of the Obligations, then in any of such events, all of the reasonable attorneys' fees arising from such services, and any expenses, costs and charges relating to such matters, shall be part of the Obligations, payable on demand and secured by the Collateral.

f.      Indemnity. The Borrower agrees to indemnify, reimburse and hold harmless the Lender, and its successors, assigns, employees, affiliates and agents pursuant to the indemnity provisions set forth in the Security Agreement.

g.      Counterparts. This Agreement may be executed by any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute but one and the same instrument.

h.      References. Each reference herein to the Lender shall be deemed to include its successors and assigns, and each reference to the Borrower and any pronouns referring thereto as used herein shall be construed in the masculine, feminine, neuter, singular or plural, as the context may require, and shall be deemed to include the legal representatives, successors and assigns of the Borrower, all of who shall be bound by the provisions hereof.

      i.      Headings.  The section headings herein are included for convenience only and shall not be deemed to be a part of this Agreement.

      j.      Choice of Law, Forum.

**THE VALIDITY, INTERPRETATION, ENFORCEMENT AND EFFECT OF THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS.  THE LENDER'S PRINCIPAL PLACE OF BUSINESS IS LOCATED IN ROCK ISLAND COUNTY IN THE STATE OF ILLINOIS, AND THE BORROWER AGREES THAT THIS AGREEMENT SHALL BE DELIVERED TO AND HELD BY LENDER AT SUCH PRINCIPAL PLACE OF BUSINESS, AND THE HOLDING OF THIS AGREEMENT BY LENDER THEREAT SHALL CONSTITUTE SUFFICIENT MINIMUM CONTACTS OF BORROWER WITH ROCK ISLAND COUNTY AND THE STATE OF ILLINOIS FOR THE PURPOSE OF CONFERRING JURISDICTION UPON THE FEDERAL AND STATE COURTS PRESIDING IN SUCH COUNTY AND STATE. BORROWER CONSENTS THAT ANY LEGAL ACTION OR PROCEEDING ARISING HEREUNDER MAY BE BROUGHT IN THE DISTRICT COURT OF THE STATE OF ILLINOIS, ROCK ISLAND COUNTY, ILLINOIS OR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF ILLINOIS AND ASSENTS AND SUBMITS TO THE PERSONAL JURISDICTION OF ANY SUCH COURT IN ANY ACTION OR PROCEEDING INVOLVING THIS AGREEMENT. NOTHING HEREIN SHALL LIMIT THE JURISDICTION OF ANY OTHER COURT.  ANY PROVISION OF THE SECURITY AGREEMENT WHICH PROVIDES GREATER OR DIFFERING RIGHTS TO THE LENDER IS INCORPORATED HEREIN AND MAY BE EXERCISED AT THE DISCRETION OF THE LENDER.**

      k.      Waiver of Jury Trial.

**BORROWER HEREBY WAIVES ANY RIGHT THAT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, THE LOAN DOCUMENTS OR THE LOAN, OR (B) IN ANY WAY CONNECTED WITH OR PERTAINING OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF LENDER AND/OR BORROWER WITH RESPECT TO THE LOAN DOCUMENTS OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF EITHER PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. BORROWER AGREES THAT LENDER MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY, AND BARGAINED AGREEMENT OF BORROWER**

**IRREVOCABLY TO WAIVE ITS RIGHT TO TRIAL BY JURY AS AN INDUCEMENT OF LENDER TO MAKE THE LOAN, AND THAT, TO**

**THE EXTENT PERMITTED BY APPLICABLE LAW, ANY DISPUTE OR CONTROVERSY WHATSOEVER BETWEEN BORROWER AND LENDER SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.   ANY PROVISION OF THE SECURITY AGREEMENT WHICH PROVIDES GREATER OR DIFFERING RIGHTS TO THE LENDER IS INCORPORATED HEREIN AND MAY BE EXERCISED AT THE DISCRETION OF THE LENDER.**

**IMPORTANT:   READ BEFORE SIGNING.   THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE.   NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED.   YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

**FIRST MIDWEST BANK**

By _____
Drew Lawrence
Its Officer

I80 EQUIPMENT, LLC, an Illinois limited liability company

By _____
Erik Jones, Its Sole Member

## *Exhibit List*

**Exhibit A** ....................... Working Capital Line of Credit Promissory Note

**Exhibit B** ....................... Secondary Working Capital Line of Credit Promissory Note

**Exhibit C** ....................... Third Working Capital Line of Credit Promissory Note

**Exhibit D** ...................... Permitted Liens

**Exhibit E** ....................... Subordinated Debt

**Exhibit F** ....................... Subsidiaries

**Exhibit G** ...................... Guaranty

**Exhibit H** ....................... Trade Names

**Exhibit I** ........................ Borrowing Base Certificate – Working Capital Line of Credit
Promissory Note

**Exhibit J** ........................ Borrowing Base Certificate – Secondary Working Capital Line of
Credit Promissory Note

**Exhibit K** ....................... Borrowing Base Certificate – Third Working Capital Line of Credit
Promissory Note

# EXHIBIT A

## WORKING CAPITAL LINE OF CREDIT PROMISSORY NOTE

See attached.

**Loan Number 800025989 -68914**

## WORKING CAPITAL LINE OF CREDIT
## PROMISSORY NOTE

$9,500,000.00

**FOR VALUE RECEIVED**, the undersigned, **I80 EQUIPMENT, LLC**, an Illinois limited liability company (the "Borrower"), promises to pay to the order of FIRST MIDWEST BANK (the "Lender"), an amount not to exceed the sum of  Nine Million Five Hundred Thousand and no/100 Dollars ($9,500,000.00) or, if less, the aggregate unpaid principal of the Working Capital Line of Credit Loan made by the Lender to the Borrower pursuant to Loan Agreement dated March 9, 2015, by and between the Borrower and the Lender (collectively the "Agreement"), together with interest from the date hereof on the unpaid principal balance payable pursuant to the terms of the Agreement.  The limitations on borrowing set forth in the Agreement shall govern notwithstanding the face amount hereof.  Capitalized terms used and not otherwise defined herein shall have the same meaning herein as in the Agreement.

The loan evidenced hereby shall bear interest on the actual principal amount from time to time outstanding at a rate per annum prior to maturity (computed on the basis of a year of 360 days), which shall be the rate established in the Agreement as the Working Capital Line of Credit Interest Rate.  Upon the occurrence of an Event of Default, including a failure to make any payment including payment at final maturity, allowing a ten (10) day grace period for payments, the interest shall be four percent (4%) greater than that required by the Agreement. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.  If any interest or charge should be determined by a Court of competent jurisdiction to exceed the maximum amount permitted by law, the interest or charge shall be reduced to the maximum permitted.  Subject to applicable law, if any payment is not made within ten (10) days of its due date, in addition to the increased interest rate stated above, the Lender may collect a delinquency charge of Five Percent (5%) or $10.00, whichever is greater, of the unpaid amount then due.  Collection of this late payment fee shall not be deemed a waiver of Lender's right to declare a default hereunder.

Borrower shall make payments to Lender as more specifically set forth in the Agreement.

Both principal and interest are payable without set off, counterclaim or deduction of any kind in lawful money of the United States of America on the dates and in the manner set forth in the Agreement as it now exists or may be hereafter amended, as appropriate.  All unpaid principal and interest and all other monetary obligations owing under the Agreement shall be due and payable on June 10, 2016, unless earlier payable under the terms of the Agreement.

This promissory note is the Working Capital Line of Credit Promissory Note referred to in the Agreement, and is entitled to the benefits and is subject to the terms of the Agreement, including, without limitation, the limitation on the amount of funds to be borrowed from the Lender from time to time prior to maturity. This Working Capital Line of Credit Promissory Note is secured by the liens against Collateral as granted under the Agreement. The principal of this Working Capital Line of Credit Promissory Note is prepayable in any amount and its maturity is subject to acceleration upon the terms and conditions set forth therein.

If this Working Capital Line of Credit Promissory Note is not paid when due (whether at maturity or upon acceleration or demand), the Borrower agrees to pay all costs of collection including reasonable attorney fees and legal expenses incurred by the Lender or its agents.

Presentment for payment, demand, notice of dishonor, protest, and notice of protest are hereby expressly waived.

This Working Capital Line of Credit Promissory Note is being delivered in the State of Illinois and shall be construed and enforced in accordance with the laws of the State of Illinois.

**IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

Executed this ___ day of _____, 2015.

**I80 EQUIPMENT, LLC**, an Illinois limited liability company

By_____
    Erik Jones, Its Sole Member

## EXHIBIT B

### SECONDARY WORKING CAPITAL LINE OF CREDIT PROMISSORY NOTE

See attached.

**Loan Number 800025989-68915**

## SECONDARY WORKING CAPITAL LINE OF CREDIT
## PROMISSORY NOTE

$500,000.00

      **FOR VALUE RECEIVED**, the undersigned, **I80 EQUIPMENT, LLC,** an Illinois limited liability company (the "Borrower"), promises to pay to the order of FIRST MIDWEST BANK (the "Lender"), an amount not to exceed the sum of Five Hundred Thousand and no/100 Dollars ($500,000.00) or, if less, the aggregate unpaid principal of the Secondary Working Capital Line of Credit Loan made by the Lender to the Borrower pursuant to Loan Agreement dated March 9, 2015, by and between the Borrower and the Lender (collectively the "Agreement"), together with interest from the date hereof on the unpaid principal balance payable pursuant to the terms of the Agreement. The limitations on borrowing set forth in the Agreement shall govern notwithstanding the face amount hereof. Capitalized terms used and not otherwise defined herein shall have the same meaning herein as in the Agreement.

      The loan evidenced hereby shall bear interest on the actual principal amount from time to time outstanding at a rate per annum prior to maturity (computed on the basis of a year of 360 days), which shall be the rate established in the Agreement as the Secondary Working Capital Line of Credit Interest Rate. Upon the occurrence of an Event of Default, including a failure to make any payment including payment at final maturity, allowing a ten (10) day grace period for payments, the interest shall be four percent (4%) greater than that required by the Agreement. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law. If any interest or charge should be determined by a Court of competent jurisdiction to exceed the maximum amount permitted by law, the interest or charge shall be reduced to the maximum permitted. Subject to applicable law, if any payment is not made within ten (10) days of its due date, in addition to the increased interest rate stated above, the Lender may collect a delinquency charge of Five Percent (5%) or $10.00, whichever is greater, of the unpaid amount then due. Collection of this late payment fee shall not be deemed a waiver of Lender's right to declare a default hereunder.

      Borrower shall pay interest to the Lender upon the outstanding daily principal balance owing hereunder, which interest shall be computed at the close of each day under the terms of the Agreement and shall be payable monthly on the 28th day of each month.

      Both principal and interest are payable without set off, counterclaim or deduction of any kind in lawful money of the United States of America on the dates and in the manner set forth in the Agreement as it now exists or may be hereafter amended, as appropriate. All unpaid principal and interest and all other monetary obligations owing under the Agreement shall be due and payable on June 10, 2016, unless earlier payable under the terms of the Agreement.

This promissory note is the Secondary Working Capital Line of Credit Promissory Note referred to in the Agreement, and is entitled to the benefits and is subject to the terms of the Agreement, including, without limitation, the limitation on the amount of funds to be borrowed from the Lender from time to time prior to maturity. This Secondary Working Capital Line of Credit Promissory Note is secured by the liens against Collateral as granted under the Agreement. The principal of this Secondary Working Capital Line of Credit Promissory Note is prepayable in any amount and its maturity is subject to acceleration upon the terms and conditions set forth therein.

If this Secondary Working Capital Line of Credit Promissory Note is not paid when due (whether at maturity or upon acceleration or demand), the Borrower agrees to pay all costs of collection including reasonable attorney fees and legal expenses incurred by the Lender or its agents.

Presentment for payment, demand, notice of dishonor, protest, and notice of protest are hereby expressly waived.

This Secondary Working Capital Line of Credit Promissory Note is being delivered in the State of Illinois and shall be construed and enforced in accordance with the laws of the State of Illinois.

**IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

Executed this _____ day of _____, 2015.

**I80 EQUIPMENT, LLC**, an Illinois limited liability company

By_____
Erik Jones, Its Sole Member

# EXHIBIT C

## THIRD WORKING CAPITAL LINE OF CREDIT PROMISSORY NOTE

See attached.

**Loan Number 800025989-70501**

## THIRD WORKING CAPITAL LINE OF CREDIT
## PROMISSORY NOTE

$2,000,000.00

      **FOR VALUE RECEIVED**, the undersigned, **I80 EQUIPMENT, LLC,** an Illinois limited liability company (the "Borrower"), promises to pay to the order of FIRST MIDWEST BANK (the "Lender"), an amount not to exceed the sum of Two Million and no/100 Dollars ($2,000,000.00) or, if less, the aggregate unpaid principal of the Third Working Capital Line of Credit Loan made by the Lender to the Borrower pursuant to Loan Agreement dated March 9, 2015, by and between the Borrower and the Lender (collectively the "Agreement"), together with interest from the date hereof on the unpaid principal balance payable pursuant to the terms of the Agreement. The limitations on borrowing set forth in the Agreement shall govern notwithstanding the face amount hereof. Capitalized terms used and not otherwise defined herein shall have the same meaning herein as in the Agreement.

      The loan evidenced hereby shall bear interest on the actual principal amount from time to time outstanding at a rate per annum prior to maturity (computed on the basis of a year of 360 days), which shall be the rate established in the Agreement as the Third Working Capital Line of Credit Interest Rate. Upon the occurrence of an Event of Default, including a failure to make any payment including payment at final maturity, allowing a ten (10) day grace period for payments, the interest shall be four percent (4%) greater than that required by the Agreement. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law. If any interest or charge should be determined by a Court of competent jurisdiction to exceed the maximum amount permitted by law, the interest or charge shall be reduced to the maximum permitted. Subject to applicable law, if any payment is not made within ten (10) days of its due date, in addition to the increased interest rate stated above, the Lender may collect a delinquency charge of Five Percent (5%) or $10.00, whichever is greater, of the unpaid amount then due. Collection of this late payment fee shall not be deemed a waiver of Lender's right to declare a default hereunder.

      Borrower shall make payments to Lender as more specifically set forth in the Agreement.

      Both principal and interest are payable without set off, counterclaim or deduction of any kind in lawful money of the United States of America on the dates and in the manner set forth in the Agreement as it now exists or may be hereafter amended, as appropriate. All unpaid principal and interest and all other monetary obligations owing under the Agreement shall be due and payable on June 10, 2016, unless earlier payable under the terms of the Agreement.

This promissory note is the Third Working Capital Line of Credit Promissory Note referred to in the Agreement, and is entitled to the benefits and is subject to the terms of the Agreement, including, without limitation, the limitation on the amount of funds to be borrowed from the Lender from time to time prior to maturity. This Third Working Capital Line of Credit Promissory Note is secured by the liens against Collateral as granted under the Agreement. The principal of this Third Working Capital Line of Credit Promissory Note is prepayable in any amount and its maturity is subject to acceleration upon the terms and conditions set forth therein.

If this Third Working Capital Line of Credit Promissory Note is not paid when due (whether at maturity or upon acceleration or demand), the Borrower agrees to pay all costs of collection including reasonable attorney fees and legal expenses incurred by the Lender or its agents.

Presentment for payment, demand, notice of dishonor, protest, and notice of protest are hereby expressly waived.

This Third Working Capital Line of Credit Promissory Note is being delivered in the State of Illinois and shall be construed and enforced in accordance with the laws of the State of Illinois.

**IMPORTANT: READ BEFORE SIGNING. THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE. NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

Executed this ___ day of _____, 2015.

> **I80 EQUIPMENT, LLC**, an Illinois limited liability company
>
> By_____
>      Erik Jones, Its Sole Member

## EXHIBIT D

## PERMITTED LIENS

It is understood and agreed that certain inventory has been in the past and may in the future be acquired by the Borrower on temporary short-term (120 days or less) credit which is offered by certain auction houses, Vendors and Manufacturers provided, that any short-term purchase money financing is paid off on or before the date it comes due and that Lender has not provided Borrower with written notice to discontinue third-party short-term purchase money financing.

# EXHIBIT E

## SUBORDINATED DEBT

NONE.

## EXHIBIT F

### SUBSIDIARIES

NONE.

# EXHIBIT G

## GUARANTY

See attached.

## GUARANTY

THIS GUARANTY is made and entered into as of the 9th day of March, 2015, by **ERIK JONES,** of the County of Henry,  State of Illinois, whose address is 20490 East 550th Street, Colona, IL 61241 (the "Guarantor") in favor of **FIRST MIDWEST BANK**, a national banking corporation, whose address is 506 15th Street, Moline, IL 61265 (the "Lender").

WITNESSETH THAT:

A.   I80 Equipment, LLC, an Illinois limited liability company ("Borrower") has requested the Lender make certain line of credit loans to the Borrower (collectively the "Loan"), and the Lender has agreed to make the Loan pursuant to a First Amended and Restated Loan Agreement dated as of the date hereof (the "Loan Agreement"), between the Borrower and the Lender;

B.   In order to induce the Lender to make the Loan, and as additional security for the Loan and for all sums advanced under the Loan Agreement and for the payment and performance by Borrower of its obligation under the Loan Agreement, Borrower has agreed to obtain, and Guarantor has agreed to execute, deliver and perform, this Guaranty; and

C.   The Lender has refused to make the Loan to Borrower unless this Guaranty is executed by Guarantor and is delivered to Lender;

NOW, THEREFORE, in consideration of Lender's agreement to make the Loan to Borrower in accordance with the terms of the Loan Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Guarantor, Guarantor hereby covenants and agrees that the foregoing recitals are true and correct and are by this reference made a part hereof as if fully set forth below, and further covenant and agree with Lender as follows:

1.   Guarantor, for himself, his heirs, executors, administrators, personal representatives, legal representatives, successors and assigns, hereby primarily, unconditionally, absolutely and irrevocably guaranty to Lender and to its successors and assigns:

a.   That all payments due and payable under the Loan Agreement including, but not limited to, payments of principal and interest (including, but not limited to, interest accruing under the Loan Agreement after the filing of any petition under applicable federal bankruptcy laws and any amounts paid by Borrower to Lender and required to be disgorged by Lender as preferential payments under any applicable bankruptcy laws), shall be fully and punctually paid in accordance with the terms of the Loan Agreement, as and when due, and whether or not accelerated pursuant to the terms of the Loan Agreement,

       b.      That Borrower shall fully and punctually pay, comply with and perform all of the obligations, terms, covenants and conditions of the Loan Agreement and any ancillary document required by or referred to in the Loan Agreement, to be by it paid, complied with or performed,

       c.      That all warranties and representations made by Borrower in the Loan Agreement or in connection therewith are true and correct when made or renewed, and,

       d.      If the payments due and payable under the Loan Agreement shall not be so paid, or if Borrower shall fail or refuse to so pay, comply with or perform said obligations, terms, covenants and conditions of the Loan Agreement or any ancillary document required by or referred to in the Loan Agreement, Guarantor:

       (i)      shall so pay such payments,

       (ii)      shall so pay, comply with and perform the obligations, terms, covenants and conditions with respect to which Borrower has failed or refused to pay, comply with or perform, whether or not the Loan Agreement has been accelerated pursuant to the terms thereof,

       (iii)      shall pay Lender's attorneys' fees and all court costs incurred by Lender in enforcing or protecting, or obtaining the right to enforce or protect, whether in bankruptcy court, probate court or otherwise, any of Lender's rights, remedies or recourses hereunder or thereunder (prior to trial, at trial and on appeal and whether or not Lender prevails therein), and

       (iv)      shall reimburse Lender for all damages suffered by Lender as the result of the incorrectness or untruthfulness of said warranties and representations, all without cost or expense to Lender.

       2.      The obligations and liabilities of Guarantor hereunder shall be primary and not secondary. In addition to all other rights of Lender to accelerate the indebtedness evidenced by the Loan Agreement, if:

       a.      an Event of Default (as such term is defined in the Loan Agreement) shall occur and be continuing which, pursuant to the terms of the Loan Agreement, would entitle Lender to accelerate said indebtedness, but

       b.      there shall be filed with respect to Borrower a petition in bankruptcy or for similar relief under the United States Bankruptcy Code or any similar law, and by reason of such filing or as a result of any order of court

Lender shall be prevented from accelerating or collecting said indebtedness, or, after such acceleration, if Borrower's right to make periodic payments on said indebtedness shall be reinstated by the court in the bankruptcy or insolvency proceeding, then Lender shall have the right to demand from Guarantor payment in full of, and Guarantor shall pay in full, all

indebtedness evidenced or secured by the Loan Agreement and/or any ancillary document required by or referred to in the Loan Agreement, including all principal, interest, costs, expenses, fees and charges, whether or not then due and payable by Borrower.

     3.     The Loan Agreement, any ancillary document required by or referred to in the Loan Agreement, and all other documents which now or hereafter evidence or secure the Loan (collectively, the "Loan Documents") are hereby made a part of this Guaranty by reference thereto with the same force and effect as if fully set forth herein. Guarantor hereby acknowledges having received a true, correct and complete copy of each of the Loan Documents.

     4.     Guarantor hereby agrees that Lender may take other guaranties, collateral or security to further secure the Loan Documents, or any of them, and consent that any of the obligations, terms, covenants and conditions contained in the Loan Documents may be renewed, altered, extended, supplemented, changed, modified or released at Lender's written direction, or with Lender's written consent, without in any manner affecting this Guaranty or releasing Guarantor herefrom, and without the further consent of or notice to Guarantor, and Guarantor shall continue to be liable hereunder to pay and perform pursuant hereto and to the Loan Documents, as so renewed, altered, extended, supplemented, changed, modified or released, and notwithstanding the taking of such other guaranties, collateral or security. This Guaranty is additional and supplemental to any and all other guaranties heretofore or hereafter executed by Guarantor, or by any other person, party or entity for the benefit of Lender, Borrower or any other person, party or entity, or relating to the Loan Documents or any other loan documents, and shall not supersede or be superseded by any other document or guaranty executed by Guarantor or by any other person, party or entity, for any purpose. Guarantor hereby agrees that any collateral may be released from, and any new or additional security may be added to, the lien and security interest of the Loan Documents; Borrower, Guarantor, and any additional parties who are or may become liable for payment or performance of the Loan Documents may hereafter be released from its or their liability hereunder and/or under the Loan Documents; Lender may perfect or fail to perfect, or to continue the perfection of, any lien or security interest or the priority thereof; and Lender may take, or delay in taking, or refuse to take, any and all actions with reference to the Loan Documents (regardless of whether the same might vary the risk or alter the rights, remedies or recourses of Guarantor), including specifically the settlement or compromise of any amount allegedly due thereunder, all without notice to, consideration to or the consent of Guarantor, and without in any way releasing, diminishing or affecting the absolute nature of Guarantor's joint and several obligations and liabilities hereunder.

     5.     Guarantor hereby waives any and all legal requirements that Lender, or its successors or assigns, must institute any action or proceeding at law or in equity or exhaust their rights, remedies or recourses against Borrower or anyone else with respect to the Loan Documents, or against any security for the Loan, as a condition precedent to bringing an action against Guarantor upon this Guaranty. Guarantor agrees that Lender may simultaneously maintain an action upon this Guaranty and an action or proceeding upon the Loan Agreement, or to foreclose or otherwise enforce any other Loan Document. All remedies afforded to Lender, and its successors or assigns, by reason of this Guaranty and the Loan Documents, are separate and cumulative remedies, and no one of such remedies, whether exercised by Lender, or its successors or assigns, or not, shall be deemed an exclusion of any of the other remedies available

to Lender or its successors or assigns, at law, in equity, by statute, under the Loan Documents, hereunder or otherwise, and shall in no way limit or prejudice any such other remedies which Lender, or its successors or assigns, may have, all of which may be exercised simultaneously or serially and in any order.  Guarantor further waives any requirement that Lender demand or seek payment or performance by Borrower or by any other party of the amounts owing or the covenants to be performed under the Loan Documents, as a condition precedent to bringing any action against Guarantor upon this Guaranty, it being agreed that a failure to pay, comply with or perform the obligations, terms, covenants and conditions herein guarantied, or any breach of a representation or warranty herein guarantied, shall, without further act, make Guarantor liable as herein set forth.  All payments made by Borrower, by Guarantor or by any other party, or the proceeds of any security, may be applied by Lender upon such items of indebtedness owed to Lender in such order as Lender may determine, whether the same be due or not.

6.      Until the indebtedness evidenced and secured by the Loan Documents is paid in full, and until each and all of the terms, covenants and conditions of the Loan Documents and of this Guaranty are fully performed, Guarantor shall not be released by any act, omission or thing which might, but for this provision of this Guaranty, be deemed a legal or equitable discharge of a surety or guarantor, or by reason of any waiver, extension, modification, forbearance or delay by Lender, or its successors or assigns, or its or their failure to proceed promptly or otherwise, or by reason of any further obligation or agreement between Borrower and the then holder of the Loan Agreement, relating to the payment of any sum evidenced thereby or to any of the other terms, covenants and conditions contained therein or in the other Loan Documents, and Guarantor hereby expressly waives and surrenders any defense to liability hereunder based upon the foregoing acts, omissions, things, waivers, extensions, modifications, forbearances, delays, obligations, agreements, or any of them.  Guarantor also waives any defense arising by virtue of any disability, insolvency, bankruptcy, lack of authority or power, death, insanity, incompetence, liquidation or dissolution of Borrower, of Guarantor, or of any other surety, co-maker, endorser or guarantor, even though rendering the Loan Agreement or any of the other Loan Documents invalid, void, unenforceable or otherwise uncollectible, it being agreed that Guarantor shall remain liable hereunder, regardless of whether Borrower or any other person, firm or entity be found not to be liable thereunder or hereunder for any reason, and regardless of any claim which Guarantor might otherwise have against Lender by virtue of Lender's invocation of or failure to invoke any right, remedy or recourse given to it hereunder or under the Loan Documents.  No change in the ownership of Borrower or in Borrower's members, and no sale, transfer or conveyance by Borrower of the Collateral, shall affect or change the terms of this Guaranty or in any way change or reduce the liability of Guarantor hereunder.

7.      To the extent permitted by law, Guarantor hereby waives the benefits of homestead exemptions and all other exemptions to which Guarantor may be entitled, and Guarantor hereby waives diligence in collection, presentment for payment, demand, protest, notice of nonpayment, notice of protest and of dishonor, notice of extension of time for payment, notice of acceptance hereof, notice of future advances, notice of default, notice of acceleration, notice of intent to accelerate, notice of intent to proceed against any collateral and all other notices now or hereafter provided for by law.

8.     In the event that Guarantor shall advance or become obligated to pay any sums hereunder, or in the event that for any reason Borrower is now or shall hereafter become indebted or obligated to Guarantor, the amount of such sums and of such indebtedness and obligation shall at all times be subordinate as to lien, time of payment and in all other respects to the amounts owing to Lender under the Loan Documents.  No Guarantor shall have any right to participate in any way in the Loan Agreement, in the other Loan Documents or to receive payments from Borrower upon any such indebtedness or obligation, notwithstanding any payments made by said Guarantor hereunder, all rights of reimbursement, indemnification, subordination and participation being hereby expressly waived by Guarantor unless and until all indebtedness evidenced and secured by the Loan Documents has been irrevocably paid in full. Guarantor agrees that following the occurrence and during the continuance of an Event of Default under the Loan Documents, and until the indebtedness evidenced and secured by the Loan Documents shall have been irrevocably paid in full:

a.     Guarantor will not accept any payment or satisfaction of any kind of any indebtedness or obligation of Borrower to Guarantor, and

b.     Guarantor hereby assigns to Lender all right, title and interest in such indebtedness and obligations, including the right to file proof of claim and to vote thereon in connection with any bankruptcy, insolvency or reorganization proceeding, and including the right to vote on any plan of arrangement or reorganization.

9.     Further, as long as Guarantor remains liable hereunder, and unless and until the indebtedness evidenced and secured by the Loan Documents shall have been irrevocably paid in full, Guarantor agrees that following the occurrence and during the continuance of an Event of Default under the Loan Documents:

a.     no Guarantor shall accept payment from any other guarantor by way of contribution on account of any payment made hereunder by said Guarantor to Lender,

b.     Guarantor shall not take any action to exercise or enforce any rights to such contribution, and

c.     if Guarantor should receive any payment, satisfaction or security for any indebtedness or obligation of Borrower to said Guarantor or for contribution by another guarantor for payment made hereunder by said Guarantor to Lender, the same shall be delivered to Lender in the form received, endorsed or assigned as may be appropriate, for application on account of or as security for the indebtedness evidenced and secured by the Loan Documents, and, until so delivered, shall be held in trust for Lender as security for said indebtedness.

Nothing contained herein shall in any way affect the rights of Guarantor to seek contribution from other guarantors after the indebtedness evidenced and secured by the Loan Documents shall have been irrevocably paid in full.

10.    Guarantor hereby warrants and represents unto Lender that:

a.    any and all balance sheets, net worth statements and other financial statements, data and information which have heretofore been given to Lender with respect to said Guarantor fairly and accurately represent the financial condition of said Guarantor as of the dates thereof, and, since the dates thereof, there has been no material adverse change in the financial condition of said Guarantor;

b.    except as may be set forth on any exhibit attached hereto,

(i)    there are no legal proceedings, material claims or demands pending against, or to the knowledge of said Guarantor threatened against, said Guarantor or any of said Guarantor's assets, which, if adversely decided, would materially affect said Guarantor's ability to perform its obligations hereunder,

(ii)    said Guarantor is not in material breach or default under any recourse obligation to pay money or under any obligation (recourse or nonrecourse) to pay money to Lender, and

(iii)    no event (including specifically said Guarantor's execution and delivery of this Guaranty) has occurred which, with or without notice, the lapse of time or action by a third party, constitutes or could constitute a material breach or default under any agreement evidencing or securing a recourse obligation to pay money, under any other recourse contract or agreement to which said Guarantor is a party, or under any obligation (recourse or nonrecourse) to pay money to Lender;

c.    all representations and warranties made by Borrower with respect to said Guarantor in the Loan Agreement or in the Loan Documents are true, correct, complete and not misleading in any material respect; and

d.    said Guarantor has knowledge of Borrower's financial condition and affairs and of all other circumstances which bear upon the risk assumed by said Guarantor under this Guaranty.

11.    Guarantor hereby agrees to continue to keep itself, himself or herself informed thereof while this Guaranty is in force and agrees that Lender does not have and will not have any obligation to investigate the financial condition or affairs of Borrower or of Guarantor for the benefit of any other guarantor or to advise any guarantor of any fact respecting, or any change in, the financial condition or affairs of Borrower or any guarantor or any other circumstances which may bear upon any of the Guarantor's risk hereunder which comes to the knowledge of Lender, its directors, officers or employees at any time, whether or not Lender knows, believes, or has reason to know or to believe that any such fact or change is unknown to Guarantor or might or does materially increase the risk of Guarantor hereunder.  Guarantor shall not transfer any of his assets for the purpose of preventing Lender from satisfying any judgment rendered under this Guaranty therefrom, either before or after the entry of any such judgment. Guarantor shall promptly deliver to Borrower all financial statements of, and financial data and information relating to, said Guarantor which Borrower is required by the Loan Agreement to deliver to Lender (the "Financial Statements") in time for Borrower to deliver the same to

Lender, on or before the date provided for the delivery thereof under the Loan Agreement. Lender shall not have the right to access Guarantor's financial books and records except that in the event the Borrower has failed to deliver to Lender the Financial Statements on or before the date provided for delivery under the Loan Agreement, Guarantor shall permit the Lender to have access to said Guarantor's financial books and records for the purpose of reviewing the same.

12.     Any notice, demand or request by Lender or its successors or assigns to Guarantor shall be in writing and shall be deemed to have been duly given or made if sent by manual delivery, telegram, facsimile transmission or overnight courier, or if mailed by registered or certified mail, return receipt requested, to Guarantor at the address set forth for him in the caption hereof, or at such other address in the United States of America as Guarantor may notify Lender of for himself or herself, in writing, at least ten (10) days prior to the effective date of any such change of address, by one (1) of the means above provided for, at the address for Lender set forth in the caption hereof, or at such other address(es) of which Lender shall have so notified Guarantor, at least ten (10) days prior to the effective date of any such change of address. Notice so given shall be deemed given and made as of the dates provided for in the Loan Agreement.

13.     This Guaranty, for all purposes, shall be interpreted and construed in accordance with the internal laws of the State of Illinois, in which state it is to be performed, without giving effect to conflict of laws provisions thereof, but giving effect to federal laws of the United States applicable to national banks. The unenforceability or invalidity of any provision or provisions of this Guaranty as to any person or circumstance shall not render that provision nor any other provision or provisions herein contained unenforceable or invalid as to any other person or circumstance, and all provisions hereof, in all other respects, shall remain valid and enforceable.

14.     Notwithstanding any other provision or provisions herein contained, no provision of this Guaranty shall require or permit the collection from Guarantor of interest in excess of the maximum rate or amount, if any, which said Guarantor may be required or permitted to pay by any applicable law.

15.     Guarantor hereby agrees that, at Lender's option, any action to enforce or interpret this Guaranty may be brought and venued in any Illinois state court or federal court sitting in Rock Island County, Illinois, and Guarantor hereby consents thereto and submits himself to the jurisdiction of said courts with respect to any such action, and waive any argument that venue in such forums is not convenient. In the event Guarantor commences any action in another jurisdiction or venue under any tort or contract theory arising directly from the relationship created by this Guaranty, Lender, at its option, shall be entitled to have the case transferred to one of the jurisdictions and venues above described, or if such transfer cannot be accomplished under applicable law, to have such action dismissed without prejudice. GUARANTOR HEREBY WAIVES ANY RIGHT WHICH GUARANTOR MAY HAVE TO A TRIAL BY JURY IN ANY ACTION RELATING TO THIS GUARANTY.

16.     This Guaranty shall inure to the benefit of Lender and its successors and assigns, and shall bind Guarantor and Guarantor's heirs, executors, administrators, personal representatives, legal representatives, successors and assigns. The obligations of Guarantor under this Guaranty shall be enforceable in all events against Guarantor, his heirs, executors,

administrators, personal representatives, successors and assigns, and each of them, jointly and severally, and shall be enforceable, in the event of the death of Guarantor, as a claim against his estate or otherwise against the representatives of his estate, his heirs-at-law, the devisees and beneficiaries of his total estate and each of them.  The use of any gender herein shall include all other genders.

17.     This Guaranty may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which, together, shall constitute a single instrument.

18.     Guarantor hereby acknowledges that:

a.     said Guarantor expects to derive benefits from the making of the Loan by Lender to Borrower and finds it advantageous, desirable and in his or its best interests to execute and deliver this Guaranty to Lender;

b.     counsel has advised said Guarantor in the negotiation, execution and delivery of this Guaranty;

c.     Lender has no fiduciary relationship to said Guarantor, their relationship being that of guarantor and creditor; and

d.     no joint venture exists between said Guarantor and Lender.

IN WITNESS WHEREOF, Guarantor has duly executed this Guaranty as of the day and year first above written.

**GUARANTOR:**

**ERIK JONES**

## EXHIBIT H

## TRADE NAMES

### SCHEDULE OF MARKS AND APPLICATION;
### INTERNET DOMAIN NAME REGISTRATIONS

1.    <u>Trademarks</u>:          I-80 EQUIPMENT (Registration No. 4144917)

2.    <u>Trade Names</u>:        None

3.    <u>Domain Names:</u>      www.i80equipment.com
                               www.buckettrucksi80.com
                               www.usedaltecbuckettrucks.com

## EXHIBIT I

### BORROWING BASE CERTIFICATE –
### WORKING CAPITAL LINE OF CREDIT PROMISSORY NOTE

See attached.

Loan No._____
Borrower:  I80 Equipment, LLC

## **WORKING CAPITAL LINE OF CREDIT**
### **Borrowing Base Certificate**

**Dated:**_____

Total of 80% of Vehicle Collateral that is
Eligible Inventory including costs for
improvements per attached spreadsheet                                                $_____

Maximum Amount of Loan                          $9,500,000.00

    Total of all Advances Outstanding        ($_____)

    Total of any Charges, Expenses
    or Costs due from Borrower               ($_____)

Available Unused Loan Amount                    $_____

Amount of Requested Loan Advance                                            $_____

    The undersigned represents and warrants that the foregoing is true, complete and correct, and that the information reflected on this Certificate and on the attached spreadsheet comply with the representations and warranties set forth in the First Amended and Restated Security Agreement and in the First Amended and Restated Loan Agreement between the undersigned and First Midwest Bank dated _____, 2015.

                    I80 EQUIPMENT, LLC, an Illinois
                    limited liability company

                    By:_____
                          Erik Jones
                          its Sole Member

## EXHIBIT J

### BORROWING BASE CERTIFICATE -
### SECONDARY WORKING CAPITAL LINE OF CREDIT PROMISSORY NOTE

See attached.

Loan No._____
Borrower: I80 Equipment, LLC

## SECONDARY WORKING CAPITAL LINE OF CREDIT
### Borrowing Base Certificate

### Dated:_____

ACCOUNTS RECEIVABLE
    Eligible Accounts Receivable Book Value
    as of _____        $_____
    Additions (please explain on attachment)    $_____
    80% of Total Eligible Accounts Receivable    $_____

VEHICLE PARTS
    Total of 80% of cost of vehicle parts that are
    Eligible Inventory per attached spreadsheet    $_____

TOTAL    $_____

Maximum Amount of Loan    $500,000.00

    Total of all Advances Outstanding    ($_____)

    Total of any Charges, Expenses
    or Costs due from Borrower    ($_____)

Available Unused Loan Amount    $_____

Amount of Requested Loan Advance    $_____

    The undersigned represents and warrants that the foregoing is true, complete and correct, and that the information reflected on this Certificate and on the attached spreadsheet comply with the representations and warranties set forth in the First Amended and Restated Security Agreement and in the First Amended and Restated Loan Agreement between the undersigned and First Midwest Bank dated _____, 2015.

        I80 EQUIPMENT, LLC, an Illinois
        limited liability company

        By:_____
            Erik Jones
            its Sole Member

## EXHIBIT K

### BORROWING BASE CERTIFICATE –
### THIRD WORKING CAPITAL LINE OF CREDIT PROMISSORY NOTE

See attached.

Loan No._____
Borrower: I80 Equipment, LLC

## THIRD WORKING CAPITAL LINE OF CREDIT
### Borrowing Base Certificate

### Dated:_____

Total of 80% of Crane Collateral that is
Eligible Inventory including costs for
improvements per attached spreadsheet                    $_____

Maximum Amount of Loan                $2,000,000.00

    Total of all Advances Outstanding      ($_____)

    Total of any Charges, Expenses
    or Costs due from Borrower              ($_____)

Available Unused Loan Amount             $_____

Amount of Requested Loan Advance                          $_____

    The undersigned represents and warrants that the foregoing is true, complete and correct, and that the information reflected on this Certificate and on the attached spreadsheet comply with the representations and warranties set forth in the First Amended and Restated Security Agreement and in the First Amended and Restated Loan Agreement between the undersigned and First Midwest Bank dated _____, 2015.

                I80 EQUIPMENT, LLC, an Illinois
                limited liability company

                By:_____
                    Erik Jones
                    its Sole Member